

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-24-00541-CV

———————————————————

IN THE INTEREST OF B.C., A CHILD

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-732197-23

Before Sudderth, C.J.; Kerr and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

The trial court terminated the parental rights of Mother and Father to their son, Braxton, and both parents appealed.[1] Mother's attorney filed an *Anders* brief in which he contends that there are no arguable grounds for appeal. *See Anders v. California*, 386 U.S. 738, 744, 87 S. Ct. 1396, 1400 (1967); *see also In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, order) (holding that *Anders* procedures apply in cases terminating parental rights), *disp. on merits*, 2003 WL 2006583, at \*1–3 (Tex. App.—Fort Worth May 1, 2003, no pet.) (per curiam) (mem. op.). Father's brief contends in one issue that legally and factually insufficient evidence supports the trial court's finding that termination of Father's parental rights was in Braxton's best interest. Father's brief acknowledges that Braxton had been taken into the care of the Department of Family and Protective Services in part due to both parents' drug and alcohol use, but he argues that he demonstrated that he was rehabilitated. Father points out that he completed all of his services, including a treatment program; has stable employment; has a suitable home; and had good visits with Braxton during the case. But the record also shows that Father endangered Braxton, that he has previously been convicted of child endangerment, and that he has previously relapsed

---

[1]To protect the child in this case, we refer to him by an alias, and we refer to his family members by their relation to him. *See* Tex. R. App. P. 9.8(b)(2) (requiring courts to use aliases to refer to minors in parental-rights termination cases and, if necessary to protect the minors' identities, to also use aliases to refer to their family members); *see also* Tex. Fam. Code Ann. § 109.002(d).

after substance-abuse treatment. He also resisted drug testing for the Department during the case and had pending criminal charges at the time of trial.

Because sufficient evidence supports the trial court's best-interest finding, we will affirm the trial court's order of termination as to Father. Further, because we agree with Mother's attorney that no arguable grounds for appeal exist, we will also affirm the trial court's termination of Mother's parental rights.

**Background**

The Department initially became involved with Braxton on December 2, 2022, after receiving a report from law enforcement. According to the Department's investigator, law enforcement "had responded to a call concerning a suspicious automobile," and "[w]hen they arrived at the automobile, they found [Father] and [Mother] and [Braxton]." Father "had left the automobile[ and] was sitting on some steps, . . . intoxicated." Mother was also under the influence; she admitted to using methamphetamine, marijuana, and alcohol. According to the Department's investigator, "[Mother] was found to be in some sort of state that they were concerned and called for an ambulance. . . . They suspected a drug overdose." Both parents were arrested. Braxton was approximately five months old at the time.

When the investigator contacted Mother that night at the jail to which she had been transported, Mother admitted to having used methamphetamine that day. The investigator testified that Mother "had large bruising on both of her arms," which Mother said was the result of Father assaulting her in the car. Braxton was in the car

3

at the time of the altercation and had been in the car with Mother when she was using methamphetamine. The investigator also spoke to Father, who told her that he and Mother had been living in their car and staying "at some motels every now and then when they could."

The investigator developed a safety plan for the parents. The plan called for Braxton to live with Maternal Grandmother, with the help of Maternal Aunt and for one of those two to supervise the parents while they were around Braxton. Both parents signed the safety plan. The case was then transferred to the Family-Based Safety Services (FBSS)[2] section of the Department, where an FBSS caseworker completed the FBSS service plan. *See* 40 Tex. Admin. Code § 700.716(a) (requiring service plan for FBSS cases and discussing FBSS service plan requirements).

This initial FBSS caseworker spoke to Mother, who repeated what she had told the investigator about Father hitting her in the car with Braxton present. When the caseworker spoke to Father, he denied the assault allegation, but he claimed that he had blacked out. Father told the caseworker that he had previously completed a year-long program for alcohol treatment but had recently used alcohol. The case was transferred to another FBSS caseworker, who testified at trial that Father never participated in a drug test while she had the case, despite that being part of the plan.

---

[2]*See In re J.M.*, No. 02-21-00346-CV, 2022 WL 872542, at *1 n.3 (Tex. App.—Fort Worth Mar. 24, 2022, no pet.) (mem. op.) (explaining family-based safety services).

4

At some point during the case, in violation of the plan, Mother took Braxton and could not be located for several weeks. Braxton had been placed on the child safety check alert list, *see* Tex Fam. Code Ann. §§ 261.3022–.3023, and in April 2023, a police officer stopped Mother in response to that alert. Mother was arrested after the officer saw a methamphetamine pipe in her car. Around the time of Mother's arrest, Father was also in jail, and he had already told the caseworker that he did not have a plan for keeping Braxton safe.[3] So, when Mother was arrested, the Department took Braxton into its care and filed this child protection suit.

Trial occurred over two days. At the lunch break on the first day, the trial court ordered Father to submit to hair-strand and nail-bed drug testing, which he had not previously done. As discussed more below, Father did not complete the nail-bed test, but the hair-strand test was positive for cocaine.

The trial continued a few months later. At trial, the caseworker assigned during this child protection case testified that Father had completed all of his court-ordered services other than drug testing and that Mother had completed none of hers. Mother also failed to attend any of her visits with Braxton.

Evidence was presented at trial concerning Father's criminal history.

---

[3] The FBSS caseworker stated that she met Father at the jail on April 13, 2023, and Father signed a waiver of service in which he stated that he was incarcerated in Tarrant County, but the caseworker did not say the offense for which Father was in jail at that time.

- In 2018, Father pled guilty in Oklahoma to driving while intoxicated and to child endangerment by driving under the influence with a child in the car. He was placed on community supervision. The judgment from that case was admitted at trial in this case. Attached to the judgment was a page setting out Father's previous convictions for driving under the influence; burglary; and receiving, possessing, or concealing stolen property.

- In April 2022, Father was indicted in Texas for unlawful possession of a firearm.

- In November 2024, a warrant was issued for Father's arrest for the misdemeanor offense of assault causing bodily injury to a family member arising from his car altercation with Mother.

Evidence was also presented regarding Mother's criminal history, including a 2023 burglary charge. Additionally, the trial court also heard evidence of both parents' substance-abuse issues.

As to Mother, the trial court found the predicate termination grounds in Subsections (D), (E), (N), and (O) of Texas Family Code Section 161.001(b)(1) and found that termination was in Braxton's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O), (b)(2). As to Father, the trial court found the predicate termination grounds in Subsections (D), (E), and (L) and found that

termination of Father's parental rights was in Braxton's best interest. *See id.* § 161.001(b)(1)(D), (E), (L), (b)(2). In accordance with these findings, the trial court's order of termination terminated both parents' parental rights to Braxton.

**Standard of Review**

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one predicate ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the

7

finding if a reasonable factfinder could, and we disregard contrary evidence unless it is conclusive. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

To determine the factual sufficiency of the evidence, on the other hand, we must perform "an exacting review of the entire record" to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved the termination ground and that termination would be in the child's best interest. *In re A.B.*, 437 S.W.3d 498, 500, 502–03 (Tex. 2014); *see* Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19. But if a factfinder reasonably could not—because the disputed evidence that could not reasonably support the finding is too significant—then the evidence is factually insufficient. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). As with the legal sufficiency standard, the factfinder is the sole judge of the witnesses' credibility and demeanor, *A.B.*, 437 S.W.3d at 503, and we give due deference to the factfinder's findings, *H.R.M.*, 209 S.W.3d at 108.

## Mother's Appeal

On appeal, Mother's appointed appellate attorney filed an *Anders* brief indicating that Mother's appeal is frivolous and that there are no arguable grounds for appeal. *See Anders*, 386 U.S. at 744, 87 S. Ct. at 1400; *see also K.M.*, 98 S.W.3d at 776–

77. The brief presents a professional evaluation of the record, an analysis of potential appellate issues, and a demonstration of why there are no meritorious grounds for reversal.

Mother's appointed attorney served the *Anders* brief on Mother and informed her of her right to request the record and to file a pro se response to the *Anders* brief. *See Anders*, 386 U.S. at 744, 87 S. Ct. at 1400; *In re G.C.*, No. 02-20-00368-CV, 2021 WL 1823341, at *1 (Tex. App.—Fort Worth May 7, 2021, pet. denied) (mem. op.). This court similarly informed Mother of her rights, including her right to request a copy of the record and to file a pro se response. Mother has not sought to access the appellate record, and she did not file a timely response. The Department did not file a response.

Nonetheless, to protect Mother's rights, we independently examined the appellate record to determine if any arguable grounds for appeal exist. *See In re K.W.*, No. 02-23-00082-CV, 2023 WL 4289613, at *1 (Tex. App.—Fort Worth June 30, 2023, no pet.) (mem. op.); *see In re K.A.*, No. 02-23-00014-CV, 2023 WL 3251013, at *1 (Tex. App.—Fort Worth May 4, 2023, pet. ref'd) (mem. op.). We have done so, and our review confirms that Mother's appeal is frivolous. *See K.W.*, 2023 WL 4289613, at *1 (conducting similar *Anders* analysis and reaching similar conclusion); *K.A.*, 2023 WL 3251013, at *2 (same).

## Father's Appeal

In terminating Father's parental rights, the trial court found the predicate termination grounds in Subsection (D) and (E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). The trial court further found the termination ground in Subsection (L) and that termination was in Braxton's best interest. *See id.* § 161.001(b)(1)(L), (b)(2). In Father's sole issue on appeal, he argues that the best-interest finding is not supported by legally or factually sufficient evidence.[4]

## I. Inapplicability of Section 161.002

We begin by addressing a termination ground that Father did not expressly challenge in his brief. In addition to terminating under Section 161.001, the trial court also terminated Father's parental rights on the basis that Braxton was "under one year of age at the time the petition for termination of the parent–child relationship . . . was filed and [Father] ha[d] not registered with the paternity registry under Chapter 160." *See* Tex. Fam. Code Ann. § 161.002(b)(3) (providing that the rights of an alleged father may be terminated if "the child is under one year of age at the time the petition for termination of the parent–child relationship or for adoption is filed and [the

---

[4]Father's issue states that the evidence was insufficient to support a best-interest finding under Section 161.001(b)(2) or under Texas Family Code Section 161.003(a)(5). *See* Tex. Fam. Code Ann. § 161.001(b)(2), .003. We assume that this argument was a clerical error because the trial court's order of termination did not base termination on Section 161.003. Regardless, because the trial court did not terminate under Section 161.003, we will address only Father's Section 161.001(2) argument. *See* Tex. R. App. P. 44.1.

father] has not registered with the paternity registry under Chapter 160"). A trial court may not render an order terminating parental rights under Section 161.002 "unless the court receives evidence of a certificate of the results of a search of the paternity registry under Chapter 160 from the vital statistics unit indicating that no man has registered the intent to claim paternity." *Id.* § 161.002(e).

Generally, when an appellant does not challenge an independent ground that may support the appealed-from judgment, we affirm on that unchallenged ground. *See, e.g.*, *In re M.R.S.*, No. 04-23-00993-CV, 2024 WL 2002227, at *5 (Tex. App.—San Antonio May 7, 2024, pet. denied) (mem. op.). However, this court has previously addressed a similar situation in another case in which a father had not challenged on appeal termination under Section 161.002. In that case, we stated, "Because Father appeared at trial, unequivocally testified that he is [the child's] biological father, and requested that his parental rights not be terminated, we decline to follow the general rule in light of the facts presented here." *In re A.R.F.*, No. 02-13-00086-CV, 2013 WL 3874769, at *13 (Tex. App.—Fort Worth July 25, 2013, no pet.) (mem. op.). Likewise, here, Father appeared at trial, claimed to be the child's father, and asked that his rights not be terminated. Under the particular facts of this case, we apply *A.R.F.* and decline to follow the general rule to affirm on this unchallenged ground. *See id.*; *In re B.F.*, No. 02-23-00131-CV, 2023 WL 5615867, at *4 n.6 (Tex. App.—Fort Worth Aug. 31, 2023, no pet.) (noting that whether we follow *A.R.F.* or the general rule

regarding an unchallenged Section 160.002 ground depends on the specific facts in each case). We therefore must address Father's best-interest arguments.

## II. Best-Interest Factors Relevant to Section 161.001(b)(2)

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of factors, set out in *Holley v. Adams*, that the factfinder may apply in determining the child's best interest. 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### III. The Evidence Weighs in Favor of the Best-Interest Finding

Father's brief refers us to the evidence about him that was positive. As Father notes, he

- completed substance-abuse treatment and all of his other court-ordered services apart from drug testing, *see Holley*, 544 SW.2d at 371–72 (considering in best-interest analysis the parental abilities of the individuals seeking custody and the programs available to assist those individuals);

- maintained employment throughout the case and had appropriate housing for Braxton, *see id.* (considering stability of the home); and

- attended his weekly visits with Braxton, *see id.* (considering child's desires and parent's parental abilities).

Father's brief further asserts that his visits with Braxton were appropriate, he was bonded with and protective of Braxton, and he could be protective of Braxton outside of an observed environment. Father argues that he "has exhibited the proper parenting skills that would serve [Braxton's] best interests," that he would be "able to provide the necessities for [Braxton] if he were returned to his care," that he "did not make excuses regarding his past conduct," and that he was "rehabilitated [through] the services" provided by the Department and ordered by the court. Thus, he argues, "after considering all the evidence in the light most favorable to the [Department], no

reasonable trier of fact could form a firm belief or conviction that termination of [his] parental rights [wa]s in the best interest of the child." Rather, he says, "[he] is a success story and it could be argued the reason the Texas Legislature mandated court-ordered services in some [child protection] cases was for parents like [him] to rehabilitate themselves in order to have the opportunity to parent their children."

However, while we agree that this evidence is all positive and is contrary to the trial court's finding, Father does not address the other evidence that supports the finding.

First, Father engaged in conduct that endangered Braxton's well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E).

- The trial court had evidence from which it could believe that Father had committed domestic violence against Mother; Mother told two Department employees that he had, and Father was charged with assault against Mother.

- Further, according to Mother, Father committed that violence against her in front of Braxton.

- Father denied the assault, but he told the FBSS caseworker that he had blacked out that day.

- Additionally, it is not clear whether Mother or Father had been driving on the day in December 2022 when the assault occurred, but regardless,

14

Father was in an automobile with Braxton while intoxicated and while Mother was using drugs, leaving neither parent sober to care for Braxton.

- And importantly, at the time the December 2022 incident occurred, Father *already* had a conviction for child endangerment resulting from his intoxication.

The trial court could find from the trial evidence that Father had endangered Braxton. *See In re O.S.*, No. 02-24-00295-CV, 2024 WL 4778360, at *9 (Tex. App.—Fort Worth Nov. 14, 2024, pet. denied) (mem. op.) (noting that conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being). The trial court could also consider that endangerment in its best-interest analysis. *See C.H.*, 89 S.W.3d at 28 (holding evidence of termination ground may also be considered as best-interest evidence); *In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.— Houston [14th Dist.] 2014, pet. denied) (applying endangerment evidence in best-interest analysis); *see also In re Z.C.*, 280 S.W.3d 470, 478 (Tex. App.—Fort Worth 2009, pet. denied) (considering in best-interest analysis that father had used drugs around his children).

Evidence was also presented at trial regarding Father's criminal record, which is further evidence of endangerment.

- At the time of trial, Father had a pending misdemeanor assault charge for his assault against Mother and a charge for unlawful possession of a firearm.

- A warrant for his arrest had been issued a few days before the second trial date. The caseworker during the child protection case testified that the warrant had issued because of Father's failure to participate in his drug test for probation.

- As noted, in 2018, Father had pled guilty in Oklahoma to driving while intoxicated and to child endangerment by driving under the influence with the child in the car. He was placed on community supervision.

- Attached to that Oklahoma judgment was a page setting out Father's previous convictions for driving under the influence; burglary; and receiving, possessing, or concealing stolen property.

Further, Father invoked his Fifth Amendment privilege against self-incrimination repeatedly during the Department's cross-examination of him. In a civil case, including a termination proceeding, when a party invokes the Fifth Amendment privilege, a factfinder may draw negative inferences from that invocation. *See* Tex. R. Evid. 513(c); *In re B.B.*, Nos. 02-19-00250-CV, 02-19-00251-CV, 2020 WL 1057308, at *2 (Tex. App.—Fort Worth Mar. 5, 2020, no pet.) (mem. op.) (first citing *Wilz v. Flournoy*, 228 S.W.3d 674, 677 (Tex. 2007); and then citing *Baxter v. Palmigiano*,

16

425 U.S. 308, 318, 96 S. Ct. 1551, 1558 (1976), and *Tex. Dep't of Pub. Safety Officers Ass'n v. Denton*, 897 S.W.2d 757, 760 (Tex. 1995)). Father invoked his privilege when asked, among other questions, whether he had "a number of other felony convictions [aside from the child endangerment conviction] in Oklahoma," including for the felony offenses of burglary and of receiving, possessing, or concealing stolen property. Father also refused to answer questions about the arrest warrant that had been issued for his failing to submit to drug testing. The trial court could have drawn negative inferences from Father's refusal to answer questions about this criminal history.

In summary, the evidence indicates that Father had a pattern of engaging in criminal behavior—including child endangerment and domestic violence—and that even when his parental rights were at stake, he did not comply with the requirements that would keep him out of jail. "Routinely subjecting a child to the probability that [the child] will be left alone because [the child's] parent is in jail, endangers the child's physical and emotional well-being." *In re A.N.*, No. 01-24-00708-CV, 2025 WL 594627, at *10 (Tex. App.—Houston [1st Dist.] Feb. 25, 2025, no pet. h.) (mem. op.). The trial court could also consider this evidence relevant to whether Father could provide a stable home for Braxton.

The trial court additionally heard evidence about Father's struggle with substance abuse.

- Father testified that he never intended to drink or use drugs again. However, before the Department's involvement with Braxton, Father

17

had previously participated in a year-long substance-abuse treatment program. The trial evidence indicated that despite that program, Father had relapsed and begun drinking again.

- During the FBSS case, Father never submitted to a drug test requested by the Department.

- After the Department initiated this child protection case, Father missed seven drug tests requested by the Department. Father also declined to take a nail-bed drug test requested by the Department. That test was ordered so that the Department could check how long Father had been sober.

- Father had been undergoing urine tests as part of his probation, but Father never signed a release so that the caseworker in the child protection case could speak with his probation officer about the results, and he never submitted any of those results to the Department.

- Father explained that his lack of testing for the Department was because the lab to which the caseworker had referred him closed every day before he could get there after work. But his testimony did not show that he tried to have the testing location changed, and he did not explain why he never submitted his probation test results to the Department or signed a release.

- Father completed a hair-strand drug test on the first day of trial, and that test was positive for cocaine. There was no testimony explaining whether the results showed how recently the drug use had occurred,[5] but the test results constituted evidence that Father's substance abuse had not been limited to alcohol.

- When the trial court ordered the hair-strand testing on the first day of trial, the court also ordered Father to submit to nail-bed testing. The Department's attorney told the trial court that he was waiting for the paperwork to come through for the test. The trial court told Father to follow up with the caseworker if he did not hear from her: "Because you've got to take some responsibility. This is your child, not [the caseworker's]." The trial court told Father that the testing was "not negotiable." Father went to the facility for testing that day but could not test because his nails were too short. Despite the trial court's

---

[5]*See* 47 Am. Jur. Proof of Facts 3d 203 § 2 (noting that "[a] growing hair strand acts like a tape recorder in that if a person abstains from use for several weeks or months, then consumes a drug, and then once again abstains for an extended period, separate testing of segments cut from that person's hair will reflect this sporadic use"). Nothing in the record showed the length of the hair strand that was tested. However, the test results state that the test was performed on hair from Father's underarm rather than a hair from his head, so presumably the drug use had not been in the distant past. *See* 1 Zeese, Drug Testing Legal Manual § 2:50 (2d ed.) (stating that "[a]pproximately three inches of hair would give a drug use history of the last six months").

admonishments, and although the Department twice sent Father back for the test, Father never submitted to the testing.

- Father invoked his Fifth Amendment privilege when asked whether the trial court should be concerned that he had tested positive for cocaine and if he agreed that his child needed a sober parent. The trial court could draw a negative inference from his refusal to answer those questions.

- Additionally, Father's refusal to participate in the nail-bed test after ordered at trial to do so allowed the trial court to infer that the test would have been positive. *See In re A.C.*, No. 02-22-00321-CV, 2022 WL 18461861, at *7 (Tex. App.—Fort Worth Jan. 26, 2022, no pet.) (mem. op.). Furthermore, the trial court could have drawn a negative inference from Father's refusal to answer on Fifth Amendment grounds whether he had recently received notice of a probation violation for failure to submit to a drug test.

From this evidence, the trial court could believe that Father's past substance abuse present a danger of recurrence in the future, *see In re J.C.P.L.*, No. 01-24-00723-CV, 2025 WL 757159, at *7 (Tex. App.—Houston [1st Dist.] Mar. 11, 2025, pet. denied) (mem. op.), which was evidence that Father presented a danger to Braxton in the future. *See In re P.W.*, No. 02-24-00211-CV, 2024 WL 4293564, at *11 (Tex.

20

App.—Fort Worth Sept. 26, 2024, no pet.) (mem. op.); *see also J.O.A.*, 283 S.W.3d at 346 ("While the recent improvements made by [the father] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices."); *In re A.D.*, No. 01-24-00675-CV, 2025 WL 626433, at *11 (Tex. App.—Houston [1st Dist.] Feb. 27, 2025, pet. denied) (mem. op.) (noting that evidence of father's past pattern of drug use was relevant to his parenting abilities, the stability of his home, the emotional and physical needs of the child, and the present and future danger to the child). Further, Father's substance-abuse issues coupled with his failure to comply with drug testing when he knew that his parental rights were at risk—particularly when the trial court admonished him about submitting to the nail bed testing on the first day of trial and Father still failed to comply—are acts by Father that indicate that the existing parent–child relationship was not a proper one. *See In re J.G.*, No. 02-24-00022-CV, 2024 WL 2971693, at *11 (Tex. App.—Fort Worth June 13, 2024, no pet.) (mem. op.) (considering father's problem with alcohol abuse as evidence relating to the current and future danger to child and acts or omissions suggesting that parent–child relationship was not a proper one); *cf.* Tex. Fam. Code Ann. § 263.307 (b)(7) (listing as a best-interest factor "whether there is a history of substance abuse by the child's family or others who have access to the child's home).

The trial court also heard testimony about Father's plans for Braxton and about whether he could provide a home for his child.

- Father testified that he lived with his new wife and her parents and that they would like Braxton to live with them. The family lived on three acres, and Father's in-laws had given Father and his wife permission to build a house on the land. Father was employed and would hire childcare to take care of Braxton during the day.

- Father said that his visits with Braxton were "the highlight of [his] week." Father also testified that at the visits, Braxton "r[an] and g[ave] [Father] a hug" when he saw him.

Thus, Father presented some evidence that he has plans for Braxton and could provide a home for him, *see Holley*, 544 S.W.2d at 371–72 (considering the stability of the home and the plans for the child by the individuals seeking custody), and he also presented some evidence that he had a good relationship with Braxton, *see id.* (considering child's desires). However, the Department also presented evidence regarding Braxton's current foster placement.

- The caseworker for the child protection case testified that Braxton, who was two years old at the time of trial, was "doing very well" with his foster family; was "[v]ery happy, very outgoing, very precious'" and was meeting all his milestones.

- She further testified that the foster parents were very caring, met all his needs, and would like to adopt him.

This testimony was evidence that Braxton had a good relationship with his foster family and that the foster parents had good parenting abilities, were meeting Braxton's emotional and physical needs, had plans for Braxton, and provided a stable home. *See id.* (considering in best-interest analysis child's desires, parental abilities of the individuals seeking custody, those individuals' plans for the child, and the child's emotional and physical needs now and in the future); *see also A.D.*, 2025 WL 626433, at *10 (considering in best-interest analysis that child was well cared for by her foster family, that the foster home was safe and provided for all of her needs, and that foster family wanted to adopt her). When considering a child's needs, "[s]tability and permanence are paramount," *In re T.E.*, No. 02-24-00271-CV, 2024 WL 4631296, at *7 (Tex. App.—Fort Worth Oct. 31, 2024, no pet.) (mem. op.), and the trial court heard evidence from which it could find that Father, despite his completion of services, his employment, and his new home, could not provide such stability and permanence.

Based on the trial evidence, the trial court had factually sufficient evidence that termination was in Braxton's best interest. *See In re F.M.*, No. 14-18-00384-CV, 2018 WL 4925127, at *7 (Tex. App.—Houston [14th Dist.] Oct. 11, 2018, pet. denied) (mem. op.) ("Although a reasonable fact finder could fairly credit Mother's alleged progress and decide it justified the risk of preserving the parent relationship, we cannot say the trial court acted unreasonably in finding the child's best interest lay

elsewhere."). Because the evidence was factually sufficient, it was necessarily also legally sufficient. *See J.G.*, 2024 WL 2971693, at *8.

We overrule Father's sole issue on appeal.

## Conclusion

Having held that there are no arguable grounds for Mother's appeal and having overruled Father's sole issue, we affirm the trial court's order of termination.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: May 22, 2025

24